IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) No. 11 CR 064 |
| v. | ) Honorable Sidney I. Schenkier |
| JULIO MARINEZ-PATINO, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

On January 28, 2011, defendant, Julio Marinez-Patino, was charged with violating 8 U.S.C. § 1326(a), Reentry of Removed Aliens, for being present and found within the United States after having been deported (doc. # 1). During the defendant's initial appearance, the government moved for the defendant's pretrial detention, and this Court ordered that defendant remain detained pending a full detention hearing.

On February 1, 2011, the government submitted a memorandum in support of that motion (doc. # 6). In its memorandum, the government did not claim that if released, the defendant would attempt to flee or would present a danger to the community. Instead, the government based its request for detention on the sole ground that if this Court gave defendant pretrial release, then he would be rendered unavailable for trial because he would be involuntarily removed from the United States by Immigration and Customs Enforcement ("ICE").

At the request of defense counsel, the detention hearing was continued so that the defendant could file a written response to that argument, which the defense did on February 9, 2011 (doc. # 8). We then further continued the hearing (over the defendant's objection) so that the government could

reply in writing; the government filed its reply on February 15, 2011 (doc. # 10). On February 17, 2011, the Court conducted a hearing during which both parties presented arguments. As in its memoranda, at the hearing the government staked out the position that defendant must be detained solely because, if released on conditions by this Court, ICE would remove the defendant from the United States and thereby would frustrate the government's ability to prosecute him.

As best as we can tell, the government's argument is one that has not yet been addressed by any written decisions in this district. We therefore write to explain the reasons why, after careful consideration, we reject the government's argument. For the reasons we set forth below, we hold that the specter of a defendant's removal from the United States by ICE is not enough to establish that there is a "serious risk" that a defendant will flee, which is a prerequisite to an order of detention here (since the government does not argue defendant is a danger to the community). Moreover, we reject the government's argument that if the defendant is released, ICE has no choice but to remove the defendant from the United States. Unlike the government, this Court does not construe the relevant statutory and regulatory scheme to require ICE to interfere with the ability of a coordinate arm of the Executive Branch to prosecute a charged criminal offense.

Accordingly, we deny the government's motion for pretrial detention. We will order the defendant's release, under conditions that we will address with the parties during a separate proceeding.

I.

We begin by summarizing the relevant background information, which we draw from the criminal complaint, the report prepared by Pretrial Services, and evidentiary materials submitted by the parties in connection with the briefing and the hearings. In reciting factual information relevant

2

to the charged offense, we do so only for the purpose of addressing the issue of pretrial detention. Notwithstanding the pending charges, of course, defendant enjoys the presumption of innocence.

In the complaint, the government alleges that defendant was born in Guerrero, Mexico, in 1971, where he received eight years of education. According to the government, defendant originally entered the United States near Nogales, Arizona, in January 1987 (Compl. ¶ 4). In 1991, defendant married Maria Vargas. The two have four children, all of whom are United States citizens. Three of defendant's four siblings now reside in the United States: defendant has a brother and a sister who live in Chicago, and a sister who lives in Los Angeles, California. Defendant maintains regular contact with his siblings in the United States, and regularly speaks to his mother in Mexico by telephone.

On August 17, 1990, defendant was convicted of second degree murder in the Circuit Court of Cook County, and received a five-year sentence of imprisonment. At that time, second degree murder was a Class 1 felony under Illinois law, 750 ILCS 5/9-2(d), for which a defendant was subject to a sentence of no less than four years. 730 ILCS 5/5-8-1 (current rule at 730 ILCS 5/5-4.5-30). No evidence has been offered as to any of the details of that conviction.

According to the allegations of the complaint (Compl. ¶¶ 5-6) and the pretrial services report, on October 11, 1991, defendant was removed to Mexico by ICE officials. The government alleges that defendant reentered the United States thereafter without the required permission (*Id.* at ¶ 7). The pretrial services report states that the defendant has had additional arrests and convictions in the United States since his removal in 1991.

On August 19, 1996, defendant was arrested in Chicago for domestic battery under the alias "Rodolfo Nunez." Several years later, on October 10, 2003, defendant was arrested in Chicago and

charged with the offenses of driving under the influence of alcohol and driving with a suspended license.[1] On March 23, 2005, defendant was convicted of committing those same offenses during a separate incident in Chicago, along with the additional offenses of operating an uninsured motor vehicle and illegally possessing/transporting liquor. As a result, he was sentenced to one year of probation and home confinement. On July 23, 2010, defendant was convicted of driving under the influence of alcohol/drugs and driving on a suspended or revoked license in Des Plaines, Illinois, and was sentenced to one year of imprisonment.

This last conviction led to defendant being taken into custody by ICE. The government alleges that during a routine screening of incoming inmates at the Illinois Department of Corrections in Joliet, Illinois, defendant was encountered by ICE agents, who established that he was in the United States without legal status (Compl. ¶ 8). As a result, when defendant was paroled from his state court sentence and released from the Illinois Department of Corrections on December 18, 2010, he immediately was taken into ICE custody. On the following day, December 19, 2010, ICE administratively reinstated the 1991 removal order against the defendant, and defendant signed a form stating that he would make no statement contesting his removal (Gov.'s Mot., Ex. 1).

ICE thereupon issued an immigration detainer, which authorized defendant's immediate removal from the United States. However, defendant remained in ICE custody for the next seven weeks, during which time the United States Attorney's Office deliberated on the issue of whether to charge the defendant with a criminal offense or, instead, to forego prosecution. When the United States Attorney's Office decided to press criminal charges against the defendant, ICE transferred the

---

[1] The disposition of this charge is unknown.

defendant into the custody of the prosecutorial authorities, and on January 28, 2011, the government charged the defendant with a illegal reentry.

## II.

The government's sole argument for detaining the defendant is that the existence of an immigration detainer on defendant "necessarily means that he will not be able to appear for trial if the court releases him on bond." (Gov.'s Mot. at 2). According to the government, defendant's release would trigger a process by which ICE would arrest the defendant and summarily remove him to Mexico before trial (*Id.* at 2). The government points out that, under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, as amended, ICE must custodially detain any alien who, like the defendant, has been convicted of an aggravated felony. 8 U.S.C. §§ 1231(a)(2), 1227(a)(2)(A)(iii). Further, the INA provides that "the Attorney General *shall* remove [a detained] alien from the United States within a period of 90 days," 8 U.S.C. § 1231(a)(1)(A) (emphasis added), which begins to run upon the first of several events, including the alien's pretrial release. *See* 8 U.S.C. § 1231(a)(1)(B)(iii) ("[i]f the alien is detained or confined (except under an immigration process), [the removal period begins on] the date the alien is released from detention or confinement"). The government contends that, if released, defendant's removal to Mexico is "imminent;" therefore, the Court must detain the defendant in order to assure his appearance at trial (Gov.'s Mot. at 3).

The defendant raises three arguments in opposition to the government's motion for detention: (1) that the existence of an ICE detainer is not a statutory basis for detaining the defendant under the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* (Def.'s Mot. at 2-3), (2) that a regulatory mechanism known as a "departure-control order" can be used to suspend the defendant's removal

order pending trial (*id.* at 3), and (3) that the government's position "raises serious due process and equal protection concerns" (*Id.* at 10). We address only the first two arguments, the resolution of which is sufficient to resolve the dispute before this Court.[2]

## A.

The Bail Reform Act ("BRA") prescribes a two-step inquiry by which a court must determine whether a defendant will be released pending trial. 18 U.S.C. § 3141. When (as here) the safety of the community is not at issue, a court must first determine whether the government has shown, by a preponderance of the evidence, the existence of a serious risk that the defendant will flee. *See id.* § 3142(f)(2)(A); *U.S. v. Portes*, 786 F.2d 758, 765 (7th Cir.1985). If the government makes that showing, the BRA authorizes the pretrial detention of a defendant only if the court further finds that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required . . . ." *Id.* §§ 3142(f),(e). This process reflects the congressional judgment in the BRA that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

The BRA establishes a limited set of factors that the Court may consider when "determining whether there are conditions of release that will reasonably assure" the defendant's appearance at trial. *See* 18 U.S.C. § 3142(g). When the issue is whether a defendant may be released even if he presents a serious risk of flight, these factors are: (1) the nature and seriousness of the charge, (2) the

---

[2] The defendant argues that the government's position raises "serious" due process and equal protection concerns because it singles out a class of persons, namely "all similarly situated, non-citizen criminal defendants with ICE detainer," and renders them "ineligible for release under the Bail Reform Act" (Def.'s Mot. at 10). Since we decide the government's motion for detention on other grounds, we need not reach the issue of constitutionality. *See Ameritech Corp. v. McCann*, 403 F.3d 908, 911 (7th Cir. 2005) ("federal courts are supposed to explore all non-constitutional grounds of decision first, to ensure against unnecessary constitutional adjudication").

6

weight of the evidence against the defendant, and (3) the history and characteristics of the defendant. *Id.*

In this case, the government does not argue that if defendant is released on a bond, there would be a serious risk that he would choose to flee rather than face prosecution. Instead, the government argues that "[t]he major issue in this case is not whether defendant, an aggravated felon, is a flight risk, but whether he presents a risk of non-appearance at future court proceedings" (Gov.'s Mot. at 1-2). In essence, the government contends that removal would inevitably prevent the defendant's appearance in court, and therefore the defendant cannot be released because no condition or combination of conditions could reasonably assure his appearance at trial (Def.'s Reply at 9).

The government's reading of the BRA puts the cart before the horse. If the government does not first establish that there is a serious risk defendant will flee, the Court need not consider whether there are any conditions that could reasonably assure defendant's appearance at trial. And, risk of *involuntary* removal pursuant to an ICE detainer does not create a serious risk that a defendant will *voluntarily* flee. An ICE detainer is "an externality not under defendant's control." *United States v. Barrera-Omana*, 638 F.Supp.2d 1108, 1110 (D. Minn. 2009).

The government attempts to counter this point by arguing that "[a]lthough the BRA uses both the terms 'appearance' and 'flight'" the true focus of the BRA is to "assure the appearance of the person," not necessarily to avoid the risk of voluntary flight (Gov.'s Reply at 11). However, this argument misreads the language and structure of the BRA. Under Section 3142(f)(2)(A) of the BRA, a "serious risk that such [a] person will flee" is the impetus for holding a detention hearing in the first place. To show that there is a serious risk that a defendant will flee, the government must show that the defendant would seek to leave through some type of voluntary act. *See, e.g., Barrera-*

7

*Omana*, 638 F.Supp.2d at 1111 ("[t]he risk of nonappearance" must involve "an element of volition"); *United States v. Montoya-Vasquez*, 2009 WL 103596, at *5 (D. Neb. Jan. 13, 2009) ("'failure to appear' as used in the [BRA] is limited to the risk that the defendant may flee or abscond"); *United States v. Rembao-Renteria*, 2007 WL 2908137, at *3 (D. Minn. Oct. 2, 2007) ("the certainty of deportation does not translate into [the] certainty of flight").

The other subparts of the BRA which use the word "appearance" must be read in light of this provision. It is only if a defendant is shown to be a serious risk of flight that a court must consider whether there are conditions, or combinations of conditions, that would reasonably assure the defendant's appearance. *See United States v. Chavez-Rivas*, 536 F. Supp.2d 962, 967 (E.D. Wis. 2008) (explaining that because "§ 3142(f) limits the cases in which [detention] hearings may be held, it follows that the court may not order detention unless one of the circumstances in § 3142(f) exists"). If a defendant is not a serious flight risk, there is no occasion to consider what condition may reasonably assure appearance.

The government's attempt to conflate risk of flight and assuring appearance would have the effect of reading out of the BRA the threshold showing that there is a serious risk that the defendant will flee. As the court in *Barrera-Omana* observed, under the government's interpretation, "[n]o other factor matters;" essentially, "Congress's carefully crafted detention plan, set forth at 18 U.S.C. § 3142, would simply be overruled by an ICE detainer." 638 F.Supp.2d at 1111. Neither the structure of the BRA, nor any of its individual provisions, support the government's result.

As other courts have correctly observed, the approach that the government advocates here would, if accepted, create a *per se* rule that all defendants with an ICE detainer be denied pretrial release. *See Montoya-Vasquez*, 2009 WL 103596, at *5 (if the court were to consider an ICE

8

detainer determinative, "it would effectively mean that no aliens against whom ICE places a detainer could ever be released on conditions"). However, the government offers no authority in either case law or in the BRA to support such a rule. The BRA itself creates no *per se* category of persons who must be detained, absent an individualized inquiry into that person's risk of flight or danger to the community. Certain offenses are subject to a "rebuttable presumption" of detention, *see* 18 U.S.C. § 3142 (e) – but illegal reentry is not among them. To the contrary, even in situations where a person may be temporarily detained for seven days to permit revocation of conditional release, deportation or exclusion, lack of legal status in the United States does not automatically trigger detention. Under Section 3142(d), a judicial officer may authorize the temporary detention of a person who does not pose a danger to the community only if: (1) that person is (and was at the time the offense) "not a citizen of the United States or lawfully admitted permanent resident," and (2) that person "may flee." *See* 18 U.S.C. §§ 3142(d)(1)(B), 3142(d)(2). Thus, it is the risk that a defendant will flee, and not just his immigration status, that a court must consider under Section 3142(d). The same is true here.

In light of these provisions in the BRA, it is not surprising that many courts have refused to consider at all the likelihood of a defendant's deportation in their detention analysis. *See Barrera-Omana*, 638 F.Supp.2d at 1110 (Congress has not "told a court to consider the existence of an ICE detainer among [the 3142(g)] factors . . . [a]s such, it must be excluded from the detention analytic"); *Montoya-Vasquez*, 2009 WL 103596, at *4 (the BRA "does not permit this Court to speculate on the 'risk' that a defendant would not appear . . . due to his being removed from this country by the same government that is prosecuting him"); *United States v. Villanueva-Martinez*, 707 F.Supp.2d 855, 858 (N.D. Iowa 2010) ("[t]he court will not speculate on the possible results of pending immigration proceedings involving the defendant"). Even those courts that accord weight to the existence of an

9

ICE detainer have not applied a hard and fast rule barring the defendant's release. For example, in *New Jersey v. Fardajo-Santos*, 973 A.2d 933 (N.J. 2009), the Supreme Court of New Jersey affirmed a magistrate judge's decision to increase bail based on the defendant's newly acquired ICE detainer. *Id.* at 941. However, while the magistrate judge in that case ruled that "ICE's lodging of a detainer presented a strong risk that the defendant would not be able to appear for subsequent court proceedings," he nevertheless released the defendant on bond. *Id.* at 935. In *United States v. Campos*, 2010 WL 454903, at *1 (M.D. Ala. Feb. 10, 2010), the case upon which the government relies, the court denied bond to a defendant who had been placed under an ICE detainer, but noted that this defendant "would not [otherwise] merit release because of his criminal history and [] other reasons . . . ." *See id.* at *4 fn 4. Thus, the government can point to no instance where an otherwise-bondable defendant has been denied pretrial release based solely on the existence of an ICE detainer.

In sum, we agree with the statement in *United States v. Adomko*, 150 F. Supp. 2d 1302, 1304 (M.D. FL. 2001) that "Congress chose not to exclude deportable aliens from consideration for release or detention in criminal proceedings." An immigration removal order does not create a serious risk that a defendant will flee, and the likelihood of a defendant's deportation is not among the Section 3142(g) factors that the Court may consider. We therefore decline the government's invitation to consider the existence of defendant's ICE detainer as determinative in our detention analysis.[3]

---

[3] While refusing to give dispositive weight to the existence of an ICE detainer, we recognize this factor as relevant in assessing the risk that the defendant will flee. *See Chavez-Rivas*, 536 F. Supp. 2d at 964, n.3. But here, the government has not argued that this factor, taken together with the considerations set forth in Section 3142(g), show that there are no conditions or combination of conditions that would reasonably assure against any flight risk. The government instead seeks detention based solely on the existence of the ICE detainer, a request that we deny for the reasons we have set forth above.

## B.

A linchpin to the government's argument about the weight we should give to an ICE detainer in our detention analysis is the government's contention that in the face of that detainer, ICE must remove defendant if this Court grants him pretrial release. The defendant contends that, contrary to the government's interpretation of the INA, his removal upon release "is not a foregone conclusion" because 8 C.F.R. §§ 215.2 and 215.3 provide a regulatory mechanism by which the prosecution may request a departure-control order suspending the defendant's deportation (Def.'s Mot. at 4). We agree with defendant that his pretrial removal if we grant bond is not inevitable here – but for a different reason than the defendant advances.

Section 215.2(a) authorizes a departure-control officer to temporarily prevent an alien's departure, "if his departure would be prejudicial to the interests of the United States under the provisions of [Section] 215.3." Section 215.3, in turn, lists eleven categories of aliens whose departure would be prejudicial under the regulations, including:

> Any alien who is needed in the United States as a witness in, or as a party to, any criminal case under investigation or pending in a court in the United States: *Provided*, that any alien who is a witness in, or a party to, any criminal case pending in any criminal court proceeding may be permitted to depart from the United States with the consent of the appropriate prosecuting authority, unless such alien is otherwise prohibited from departing under the provisions of [Section 215.3].

8 C.F.R. 215.3(g). Defendant argues that, as a party to a criminal case, he falls within the category of aliens whose departure may be deemed "prejudicial" under Section 215.3(g), and thus would be subject to a departure-control order under Section 215.2(a) (Def.'s Mot. at 5-6).

After examining Section 215, we tend to agree with the court in *Fajardo-Santos* that the apparent focus of the regulation is "not [on] deportation or removal cases," but rather on "aliens

seeking to depart the United States voluntarily." *See* 973 A.2d at 938. Several features of Section 215 weigh in favor of this result.

*First*, as the *Fajardo-Santos* court observed, the legislative authority for Section 215 is contained in 8 U.S.C. § 1185(a). This statute, which is entitled "Travel Control of Citizens and Aliens," provides for regulations governing an alien's ability to "depart from" or "enter" the United States, not the government's ability to "remove" an alien (a topic which is separately addressed in 8 U.S.C. § 1231). *See* 973 A.2d at 938; 8 U.S.C. § 1185(a). *Second*, Section 215.3 describes many categories of aliens whose departure from the United States is clearly voluntarily, including aliens "seeking[ing] to depart from the United States" to disrupt national defense measures, 8 C.F.R. § 215.3(c), aliens "seek[ing] to depart" to organize a violent uprising against the United States, 8 C.F.R. § 215.3(d), and aliens who are "fugitive[s] from justice." 8 C.F.R. § 215.3(f). Conversely, while Section 215.3(j) authorizes a departure-control order for aliens "where doubt exists whether such alien[s] [are] departing voluntarily from the United States," it specifically excludes "alien[s] who [are] departing . . . subject to an order issued in . . . deportation proceedings." 8 C.F.R. § 215.3(j).[4] *Third*, the procedures that the departure-control officer must follow in preventing an alien's departure speak to the voluntary nature of "departure" itself. Section 215.2 instructs the departure-control officer to serve the alien "with a written temporary order directing him not to depart, or attempt to depart, from the United States . . . ." 8 C.F.R. § 215.2(a). Such a written order would serve no purpose if the alien were not at liberty to depart on his own volition.

---

[4] An example of this type of departure-control order can be found in *Polovchak v. Meese*, 774 F.2d 731, 733-734 (7th Cir. 1985) (evaluating a temporary departure-control order preventing the parents of a minor child from taking the child back to the Soviet Union after the child had applied for and been granted asylum in the United States).

12

We therefore are skeptical that Section 215 provides the authority for ICE to stay its hand with respect to the involuntary removal of a person subject to an ICE detainer. However, we find that Section 215 nonetheless sheds light on the question of whether the existence of a detainer requires ICE to remove a defendant who is on bond in a pending criminal proceeding. Section 215.3(g) represents ICE's determination that, when a party to a pending criminal case exits the country without the prosecuting authority's consent, his absence is prejudicial to the interests of the United States. Indeed, when ICE took custody of the defendant in December, ICE could have deported him in the first instance. *See* 8 U.S.C. § 1231(a)(5) (if the Attorney General finds that an alien has reentered the United States illegally after having been removed under an order of removal "the alien shall be removed under the prior order at any time after entry"). ICE did not do so, but instead held the defendant so that the United States Attorney's Office could exercise its discretion to prosecute the defendant. By delivering the defendant to the United States Attorney's Office in this case, rather than simply deporting him immediately, ICE yielded to the judgment of the prosecutorial arm of the Executive Branch that the public's interest in criminally prosecuting the defendant was greater than the public's interest in swiftly deporting him.

Defendant's prosecution is thus the result of both the United States Attorney's Office and ICE – two Executive Branch agencies – exercising their discretion in a coordinated effort to serve the public interest as they see it. To argue now, as the government does, that ICE's interest in deporting the defendant would suddenly trump the United States Attorney's interest in prosecuting the defendant ignores the cooperation (and exercise of discretion) that brought the defendant before this Court in the first place. It also presumes that ICE would immediately remove a defendant retained on bond and thus frustrate his criminal prosecution, when ICE itself has found that the

departure of a defendant to a pending criminal proceeding is prejudicial to the interests of the United States.

We reject the proposition that if the defendant were released on bond, ICE would act in a way that can only be described as irrational. We likewise reject the government's argument that Congress has statutorily-mandated such an irrational result.

The government first argues that 8 U.S.C. § 1231(a)(4)(A) "affirmatively prohibits suspension of the 90-day removal period based on the pendency of a criminal prosecution against the [defendant]" (Gov.'s Reply at 5). However, that section merely states that "[p]arole, supervised release, probation, or possibility of arrest or further imprisonment is not a reason to defer removal." 8 U.S.C. § 1231(a)(4)(A). The "possibility of arrest or further imprisonment" does not specifically address the situation here, where defendant has already been arrested and now faces a pending prosecution.

The government also argues that the word "shall," as used in the instruction that "the Attorney General shall remove the alien from the United States within a period of 90 days," creates an imperative for ICE to remove the defendant even in the face of a pending criminal prosecution. *See id.* §1231(a)(1)(A). However, as the Seventh Circuit has observed:

> That the legislature may have used the word "shall" or "must," rather than "may," in directing the discharge of a specified duty does not require that the statute be construed as mandatory rather than directory. A variety of factors should be considered in determining the effect to be given the statute, including whether a mandatory construction would yield harsh or absurd results.

*Bartholomew v. United States*, 740 F.2d 526, 531 (7th Cir. 1984). In this case, interpreting the INA to require defendant's removal before trial would create the harsh and absurd result of prematurely

14

terminating the judicial proceedings against him, and thwarting the public's interest in prosecuting a criminal defendant.

The government has acknowledged, and more than one court has noted, that "Congress did not anticipate the current factual scenario." *Villanueva-Martinez*, 707 F. Supp.2d at 857; *United States v. Lozano*, 2009 WL 3834081, at *4 (M.D. Ala. Nov. 16, 2009). However, while Congress may not have contemplated the intersection of the BRA and the INA in a case such as this one, we think it safe to say Congress would expect two agencies from the same branch of government to work cooperatively and to refrain from acting irrationally. ICE has already shown that it will yield to the interest of the United States Attorney's Office in bringing criminal charges against a defendant who otherwise might be subject to immediate deportation. For ICE to change course now, solely by virtue of defendant's pretrial release, would be irrational.

## CONCLUSION

For the reasons stated above, we deny the government's motion for pretrial detention based solely on the existence of an ICE detainer lodged against the defendant. We expect that upon defendant's pretrial release, ICE and the United States Attorney's Office will continue to work cooperatively so that defendant's prosecution may be brought to completion. As we have explained, the statutory scheme does not prevent these two Executive Branch agencies from doing so – as they have done up to this point.

But, even in the event that those agencies suddenly reversed course and engaged in a "turf battle[]" over the defendant, *see Barrera-Omana*, 638 F. Supp. 2d at 1112, and ICE were to remove the defendant against the wishes of the United States Attorney, our approach to this issue would remain unchanged. In deciding whether the defendant will be given pretrial release, this Court is

governed by the BRA – like the immigration law, an Act of Congress. *See Chavez-Rivas,* 536 F. Supp. 2d at 964 n.3 ("Congress's directive to the executive in [the immigration laws] does not authorize me to disregard its directive to the courts in 18 U.S.C. § 3142(d) [of the Bail Reform Act]"). Our ruling today reaffirms our duty "to treat defendant like any other [alleged] offender under the Bail Reform Act." *Id.* at 964. That duty is not dependent upon the way in which ICE decides to act.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: March 14, 2011